**In re DELTA PETROLEUM (P.R.), LTD.**

**Civ. No. 95–1169 (DRD).**

United States District Court,
D. Puerto Rico.

Jan. 31, 1996.

David P. Freedman, O'Neill & Borges, Hato Rey, PR, for The First National Bank of Boston, N.A.

Sergio A. Ramírez–de Arellano, San Juan, PR, pro se.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

### I. Introduction

The First National Bank of Boston, creditor in this Chapter 7 case, appeals from an order of the Bankruptcy Court granting trustee's counsel's final request for compensation and denying Bank's request to reconsider two previous compensation awards to said statute. Opinion and Order, *In re Delta Petroleum*, No. 93–00043 (Bankr.D.P.R. January 24, 1995) (Docket # 657). Because we hold that the bankruptcy court did not abuse its discretion in approving the final compensation award and in refusing to modify the two earlier awards, we affirm.

### II. Background

Debtor Delta Petroleum (P.R.) Ltd., a Delaware corporation, was a petroleum products wholesaler in western Puerto Rico. In October, 1988, appellant First National Bank of Boston and Delta entered into an agreement whereby the Bank extended Delta a line of credit of up to ten million dollars ($10,000,000.00), which was secured by all, or substantially all, of Debtor's property.[1]

In December, 1992, the Puerto Rico Department of Justice brought criminal charges under Article 3A of the Anti–Organized Crime Act, P.R. Laws Ann., tit. 25, § 971 *et seq.* (1979 & Butterworth Supp.1995), against Debtor, Debtor's President, Mario O. García Quintero, and several other codefendants, in the San Juan Division of the Superior Court of Puerto Rico (hereinafter "the criminal case"). Simultaneously, the Puerto Rico Department of Justice also executed several extrajudicial seizures against property held by Debtor, its President, and others, under the aegis of the Uniform Seizures Act, P.R. Laws Ann., tit. 34, § 1723 *et seq.* (1988 & Butterworth Supp.1995). The properties

seized included all of Debtor's inventory and the two bank accounts. As a result, on the following day the Bank notified Delta that it was in default and initiated foreclosure proceedings on the uncollected accounts receivable, which had not been reached by the Department of Justice.

Debtor sought immediate relief by filing a petition for reorganization under Chapter 11 of the Bankruptcy Code, Case No. 93–00043. However, a month afterwards, the Bankruptcy Court denied the Debtor's request to use the Bank's cash collateral for administrative and other expenses. Facing an impasse, Debtor, the U.S. Trustee and other creditors including the Bank, agreed to appoint Mr. Stephen B. Wyman, a resident of Springfield, Massachusetts, as Chapter 11 trustee for Delta Petroleum.

Mr. Wyman submitted an application seeking court authorization to retain Mr. Sergio Ramírez de Arellano as his attorney in the discharge of his duties as operating Trustee. In order to guarantee that Mr. Ramírez would receive compensation, the Trustee also requested a carve-out from the Bank's cash collateral, as permitted by 11 U.S.C. § 506(c). The Bank promptly filed a response consenting to Mr. Wyman's application.[2]

On May 3, 1993, Ramírez filed and served an Application for Interim Compensation and Notice ("the First Application"), in the amount of $31,317.50 in fees and $2,799.03 for expenses. In his application, Ramírez averred that the Trustee had found these amounts to be reasonable and that the Bank had agreed to a carve-out for them under 11 U.S.C. § 506(c). Since the application was unopposed, at a hearing held three weeks later, the Bankruptcy Court approved it, awarding $33,029.03 in compensation. According to the Trustee's June, 1993 Monthly

---

1. On the same date, and to guarantee the repayment of the loan, Debtor Delta Petroleum entered into two contracts with the Bank of Boston, one an industrial factoring contract, P.R. Laws Ann., tit. 10, § 551 *et seq.* (1976), and the other an assignment of accounts receivable, P.R. Laws Ann., tit. 10, § 581 *et seq.* (1976). Two years later, the factoring contract was renewed under substantially the same terms.

2. The response specifically advised that the Bank consented that its cash collateral be utilized to pay the duly-allowed compensation for Mr. Wyman, Mr. Ramírez de Arellano, and a financial consultant, in the proportion that the Trustee's disbursements to the Bank bore to total disbursements by the Trustee, and that, until such disbursements were duly accounted for, such proportion be deemed 75%.

Report filed with the court, he paid Mr. Ramírez the full amount of approved compensation on June 4, 1993.

However, on June 30, 1993, in Boston, Massachusetts, and without the intervention of their Puerto Rico counsel, the Trustee and the Bank executed a joint stipulation and Notice ("the cash collateral stipulation") which substantially modified their earlier carve-out agreement.[3] Administrative expenses, which include attorneys' compensation, were limited to $35,000, while at the same time the Bank chose not only to earmark $200,000 to compensate the Trustee for his efforts in administering the estate, but also to add $100,000 as extra compensation for the benefits accruing to the Bank from the Trustee's efforts.

At the end of August, Ramírez filed a second interim fee application;[4] since the application was unopposed, the Bankruptcy Court entered a footnote order approving the Second Application in its entirety. However, upon request for payment, the Trustee refused, claiming that there were no estate funds available and that the Bank refused to further fund any amounts exceeding the cash collateral stipulation.[5] Ramírez filed a motion requesting authorization to terminate his legal representation of the Trustee, and the court immediately granted it.

Subsequently, at the hearings held in the criminal case in November, 1993, Mr. Ramírez notified the Puerto Rico Superior Court that pursuant to the bankruptcy court order, he could no longer represent Debtor Delta Petroleum in the criminal case. However, because the court concluded that his resignation would disrupt the defense, the local court not only refused to approve the resignation but also transmitted the minutes of the hearing to the bankruptcy court. On November 9, 1993, upon receipt of the minutes, the bankruptcy court *sua sponte* entered an order vacating the prior order approving Ramírez' resignation.

On January 28, 1994, the Trustee filed his first and only application to hire new counsel for him and the estate in all matters except the ongoing criminal trial, requesting the authority to employ a Boston law firm and a San Juan law firm. Two weeks later, both Ramírez and the Puerto Rico Department of Justice opposed the Trustee's application to employ the San Juan firm, both because the firm would not defend the corporation in the criminal case, and because of an insurmountable conflict of interest, given that the former Secretary of Justice was a partner in that law firm. The bankruptcy court scheduled a hearing to discuss the matter, but denied the application when the firm failed to appear. The Trustee never again attempted to hire new counsel.

Subsequently, Ramírez filed his third fee application.[6] This time, however, the Trust-

3. In particular, the stipulation noted that the Trustee and the Bank desired to modify the previous understandings reached between them about the use of a portion of the cash collateral as follows:
　1. From the cash collateral, the Trustee could retain,
　　a. $35,000 for Administrative Expenses;
　　b. $25,000 to pay office and other out of pocket operating expenses of the Trustee;
　　c. $10,000 to pay to third parties for the preparation and delivery of bank account records of the debtor;
　　d. Up to $200,000.00 to pay the compensation for the Trustee's administration of the estate to the extent such compensation was approved by the Court.
　2. As partial compensation to the Trustee and the Trustee's financial consultant for the liquidation and collection of the Bank's collateral insofar as it had benefited the Bank, the Bank agreed to pay to the Trustee $100,000 from the cash collateral, upon the execution of the Stipulation. This sum would not be deemed to be a portion of the compensation applied for in the Trustee's June 4, 1993 fee application to the court.

4. The Second Application for Interim Compensation and Notice ("the Second Application") requested fees in the amount of $56,433.50 and $5,653.81 in expenses. Again, Ramírez averred that the Trustee had found these amounts to be reasonable, and that the Bank agreed to a carve-out for them under 11 U.S.C. § 506(c).

5. At this point in time, the Trustee has not paid the amount of compensation approved by the Bankruptcy Court in 1993, even though when Trustee filed his September 1993 monthly report, it showed an ending balance of $188,205.64.

6. The Third Application for Interim Compensation and Notice ("the Third Application") covered the time period from August 31, 1993 through March 3, 1994, and requested $54,152.00 in fees and $3,933.43 in expenses.

ee and the Bank filed objections to the application. As a result, Ramírez filed a "Renewed Motion to Resign."[7] On May 19, 1994, the Bankruptcy Court, in its own words, "finally granted one of Mr. Ramírez' multiple entreaties to relieve him from representing the Trustee as the representative of Debtor's estate in the criminal case before the State Courts," because the criminal case had been postponed and therefore it would be possible to hire new counsel without disrupting the defense. On July 11, 1994, Ramírez de Arellano filed a Supplement to his Third Application, and the Bank and the Trustee filed objections to the application.[8] The Bank also requested that the Court reconsider the interim allowances in the light of Ramírez' representation of the Trustee and its deleterious effects on estate administration. One of the Bank's main contentions was that Mr. Ramírez' activities directly led to the Court's refusal to confirm the reorganization plan submitted jointly by the Trustee and the Bank.

**7.** The stated grounds for the motion were that upon receiving from the Trustee instructions to prepare certain drafts of documents for a hearing, and reviewing the arguments suggested by the Trustee, he had reached different conclusions, so that Fed.R.Bankr.P. 9011 would preclude him from advocating the suggested arguments. Fed.R.Bankr.P. 9011 makes applicable to adversary proceedings the provisions of Fed. R.Bankr.P. 9011, which contains the bankruptcy equivalent of Fed.R.Civ.P. 11. Independently of the merits of his argument, we should note that this was not the first such clash between Mr. Ramírez and the Trustee.

**8.** The Supplement covered the period from March 4, 1994, through July 6, 1994, and requested $22,054.50 in fees and $1,040.94 in expenses.

**9.** On the same day, the Bankruptcy Court entered an order denying the confirmation of the Joint Chapter 11 Plan and converted the case to Chapter 7 of the Bankruptcy Code.

**10.** We address jurisdiction notwithstanding that no party raised the issue on appeal. Appellant Bank did argue in its brief that "Ramírez' Third Application for Interim Compensation and Notice ... as supplemented on July 11, 1994 ... was effectively his last," and appellee agreed. The point was raised, however, not to assert jurisdiction but rather to invoke § 330 of the Bankruptcy Code, 11 U.S.C.A. § 330(a)(5) (West Supp.1995), which allows the bankruptcy court

While these matters were pending, on December 14, 1994, after the trial on the merits, Delta Petroleum was acquitted of the criminal charges after a motion for peremptory acquittal. Soon afterwards, on January 24, 1995, the Bankruptcy Court issued an Opinion and Order granting substantially all the compensation Mr. Ramírez had sought.[9] The Bank now appeals from that compensation order.

### III. Jurisdiction[10]

A party may appeal as of right from a bankruptcy court's final judgment, order, or decree. 28 U.S.C. § 158(a)(1) (1993 & West Supp.1995); Fed.R.Bankr.P. 8001(a).[11] In contrast, if the order or decree is not final, the party may appeal only by leave of the district court or bankruptcy appellate panel, as the case may be. 28 U.S.C.A. § 158(a)(3); Fed.R.Bankr.P. 8001(b) & 8003.[12] Courts have applied "a more lenient standard of finality" in bankruptcy proceedings than in nonbankruptcy cases. 6 *Chapter 11 Theory and Practice: A Guide to Reorganization*

to "reduce the amount of compensation awarded under this section by the amount of any interim compensation awarded under section 331." Although determining whether or not an application for compensation is final for purposes of § 330 differs from determining whether a bankruptcy court's order is final for purposes of appeal under § 158(a)(1), the two questions are interrelated, as will be discussed below.

**11.** The court notes that Section 158(a)(2) also grants the district courts of the United States jurisdiction over appeals "from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title." These appeals are from orders increasing or decreasing the period of exclusivity that the debtor in possession enjoys to propose a reorganization plan, and so are not pertinent to the case at hand.

**12.** Some courts have perceived an ambiguity in § 158(a)(3), because its language "with leave of the court" does not specify whether the court whose leave is required is the bankruptcy or the district court, or both. We find no such ambiguity, and neither does the First Circuit. *In re Spillane*, 884 F.2d 642, 645 (1st Cir.1989). As the Advisory Committee Notes to Fed.R.Bankr.P. 8003 indicate, "[t]he motion for leave to appeal is addressed to the district court or the bankruptcy appellate panel, although filed with the clerk of the bankruptcy court."

§ 34.13 at 34:16 (James F. Queenan, Jr. et al. eds., 1994). However, perhaps it would be best to describe the difference between the bankruptcy and ordinary civil definitions of finality not as the result of any leniency, but instead of the more complicated nature of a bankruptcy case, which in the normal course of events is composed of a multiplicity of discrete proceedings. As one court has noted, there is "[a]n uninterrupted tradition of judicial interpretation in which courts have viewed a 'proceeding' within a bankruptcy case as the relevant 'judicial unit' for purposes of finality." *In re Saco Local Development Corp.*, 711 F.2d 441, 445 (1st Cir.1983). Thus, instead of "end[ing] the litigation on the merits and leav[ing] nothing for the court to do but execute the judgment,"[13] in bankruptcy an order "need not dispose of all aspects of a case in order to be final; an order which disposes of a 'discrete dispute within the larger case' will be considered final and appealable.... The order in question must, however, 'conclusively determine' the dispute." *In re American Colonial Broadcasting Corp.*, 758 F.2d 794 (1st Cir. 1985) (quoting *In re Saco*, 711 F.2d at 444).

■ Nevertheless, orders disposing of applications for compensation under Bankruptcy Code § 330 are not always easy to categorize as interlocutory or final. While the dispute over the compensation to be paid to professionals employed by the trustee or the debtor in possession is discrete from the bankruptcy case as a whole, orders under § 330 may grant either interim compensation or final compensation. Orders for interim compensation are interlocutory, and thus not appealable as of right. *In re Spillane*, 884 F.2d 642, 644 (1st Cir.1989) ("[i]t is generally held that an interim award of attorney's fees under 11 U.S.C. §§ 330(a)(1) and 331 is not final").

Conversely, orders for final compensation should be final orders for purposes of appeal under 28 U.S.C.A. § 158(a)(1). However, it is not always obvious whether the order in question is for interim or for final compensation because the Bankruptcy Code does not

define explicitly these terms. Subsection 330(a)(5) states that "the court shall reduce the amount of compensation awarded under this section by the amount of any interim compensation awarded under section 331." By implication, this subsection refers to final orders for compensation. However, this subsection is imprecise because it also implies that awards under § 330 are always for final compensation, apparently in contravention to the § 331 mandate that interim fee awards be evaluated "as is provided under section 330."

Since both final and interim awards make reference to § 330, there is no formal method of distinguishing between them. The courts' only alternative has been to develop a practical test to determine whether an order for compensation is effectively final. *In re Spillane*, 884 F.2d at 644 ("[a]t least two courts have held, however, that a fee award may be considered final where the 'order conclusively determined the entire section 330 compensation to be paid the appellees' ") (quoting *In re Yermakov*, 718 F.2d 1465, 1469 (9th Cir. 1983)); *Boddy v. United States Bankr. Court*, 950 F.2d 334, 336 (6th Cir.1991); and *In re Dahlquist*, 751 F.2d 295, 297 (8th Cir. 1985).

In the case before us, it is not immediately apparent whether the order being appealed from in this case is effectively final. The problem arises because the order appealed from does not explicitly state that it established "the entire section 330 compensation to be paid" to the appellee. However, the facts of this case indicate more clearly than in *Spillane* or *Yermakov*, that the bankruptcy court's order approving counsel's third application for compensation did, in fact, consider the appropriateness of the sum total of compensation awarded to counsel, as would be required for a effectively final order pursuant to § 330.

■ The opinion's detailed review of his role in the entire bankruptcy case and of the compensation already awarded strongly suggests that the court sought to attain propor-

---

**13.** *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). This is the standard of finality for ordinary civil cases.

tionality between the usefulness to the estate of Mr. Ramírez' services and the amount of compensation to be awarded to him. Also, at the time the order was issued, several months had passed since the court had finally authorized him to withdraw from the case. Since the application he submitted itemized only services rendered well before the date of resignation, there is no indication that any services rendered have not been itemized in one of his three applications for compensation, and therefore it is safe to conclude that there will not be any new applications forthcoming. The court concludes that the order appealed from should be treated as final [14] and thus immediately appealable.[15]

## IV. Standard of Review

■ A dispute over compensation to be paid to the Chapter 11 Trustee's former counsel is a core proceeding. Pursuant to 28 U.S.C. § 157(b)(2), "[c]ore proceedings include, but are not limited to ... matters concerning the administration of the estate." [16] In interpreting the Bankruptcy Code, the courts have taken the appointment of attorneys, pursuant to § 327,[17] and the awarding of their fees, pursuant to § 330,[18] to be comprehended within the scope of administrative matters for purposes of § 157. *In re McDaniels,* 86 B.R. 128 (Bankr.S.D. Ohio 1988) (appointment); *In re McDonald Bros. Const., Inc.,* 114 B.R. 989 (Bankr. N.D.Ill.1990) (fees).

■ The standard for reviewing a bankruptcy judge's decisions in core proceedings is considerably more deferential than the one

applicable to decisions in non-core proceedings. In non-core proceedings bankruptcy judges are limited to submitting "proposed findings of fact and conclusions of law to the district judge, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1); see also Fed. R.Bankr.P. 9033(d). Bankruptcy decisions in non-core proceedings are not subject to Section 158's provisions, and they are due little, if any, deference from the reviewing district courts.

■ In contrast, a bankruptcy judge's authority is broader in core proceedings. Subsection 157(b)(1) provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." Bankruptcy Rule 8013 provides that "[o]n appeal the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." See *In re LaRoche,* 969 F.2d 1299, 1301 (1st Cir.1992). Findings of fact in bankruptcy proceedings, as in other

---

**14.** We might also note that both parties agree that "the allowance appealed from is a final allowance." *Appellee's Brief,* p. 20. This agreement would not have bound us, however, had we concluded otherwise.

**15.** In the alternative that the order appealed from were not a final order, we would nevertheless take the notice of appeal filed by appellants to be a Motion Seeking Leave to Appeal. *In re Nitec Paper Corp.,* 43 B.R. 492 (D.C.N.Y.1984). Pursuant to § 158(a)(3), a district court may, in its discretion, grant leave to appeal from interlocutory orders of the bankruptcy court. The standards guiding the exercise of such discretion are the same as those applied by the Circuit Courts of Appeal in deciding whether to entertain appeals from the interlocutory orders of

district courts. See *In re Neshaminy Office Building Associates,* 81 B.R. 301 (E.D.Pa.1987); but see *ICMR, Inc. v. Tri–City Foods, Inc.,* 100 B.R. 51 (D.Kan.1989). In this case, we would have good reason to grant leave to appeal. 28 U.S.C.A. § 1292(b) (1993). The controversy involves a controlling question of law as to which there is substantial ground for difference of opinion, an immediate resolution of which might well advance the ultimate termination of the dispute over Mr. Ramírez' fees.

**16.** 28 U.S.C.A. § 157(b)(2)(A) (1993).

**17.** 11 U.S.C.A. § 327 (1993).

**18.** 11 U.S.C.A. § 330 (1993 & West Supp.1995).

civil cases, are clearly erroneous when the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■ In comparison, a bankruptcy court's conclusions of law are reviewable de novo, by analogy to "the familiar standards of review normally employed in appeals to the courts of appeals in civil cases generally." *In re LaRoche*, 969 F.2d at 1301; see also *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir.1994) (citing *In re LaRoche*, supra); *In re DN Associates*, 3 F.3d 512, 515 (1st Cir.1993); *In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir.1991) (citing supporting authority in various other circuits); *In re Gonic Realty Trust*, 909 F.2d 624, 626 (1st Cir.1990).

■ Discretionary decisions are reviewed under an abuse of discretion standard. *In re Gonic*, 909 F.2d at 626 ("[d]iscretionary rulings made pursuant to the Bankruptcy Code are reviewable only for abuse of discretion"). "Historically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals." *In re Martin*, 817 F.2d 175, 182 (1st Cir.1987). Hence, district courts review grants of awards of compensation for services and expenses pursuant to § 330 under an abuse of discretion standard. *In re Spillane*, 884 F.2d at 646; *Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green*, 778 F.2d 890, 894 (1st Cir.1985); *In re Boston & Maine Corp.*, 776 F.2d 2, 6 (1st Cir. 1985); *In re DN Associates*, 160 B.R. 20, 22 (D.Me.1993); *In re Casco Bay Lines, Inc.*, 25 B.R. 747, 753 (1st Cir. BAP 1982).

■ However, in exercising that discretion, the bankruptcy court must reach conclusions of law, for said court has to interpret § 330 to discover the weight the statute gives to factual considerations, as well as make findings of fact. There is no abuse of discretion when the bankruptcy judge acts in reliance of a mistaken conclusion of law or a clearly erroneous finding of fact, as long as there are sufficient other grounds for making the same decision. *T I Federal Credit Union v. Delbonis*, 72 F.3d 921, 929 (1st Cir. 1995) ("In this circuit, '[a]n appellate court is not limited to the legal grounds relied upon by the district court, but may affirm on any independently sufficient grounds.'") (citing *Estate of Soler v. Rodríguez*, 63 F.3d 45, 53 (1st Cir.1995)); *In re Spillane*, 884 F.2d at 647. A reviewing court may affirm the appealed judgment on any basis presented by the record. *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937) ("In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.").

■ Finally, the First Circuit has admonished that "[t]he bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of [§ 327(a) ] factors and to make the delicate judgment calls which such a decision entails. If he perceives a materially adverse interest, he has at his disposal an armamentarium of permissible remedies ..." *In re Martin*, 817 F.2d at 182–183. A bankruptcy court's judgment call approving fees is entitled to that same deference.

## V. Awards of Compensation under § 330

■ Awards of compensation for professional services in bankruptcy proceedings are guided by § 330(a), authorizing compensation for "actual, necessary services rendered by the ... attorney." [19] Should the court deter-

---

19. Section 330(a) provides, in pertinent part, that the bankruptcy court may award:
"(1) After [notice and hearing] ...—
(A) reasonable compensation for actual, necessary services rendered by the ... attorney ...; and
(B) reimbursement for actual, necessary expenses.
(2) The court may ... award compensation that is less than the compensation that is requested.

(3) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all the relevant factors, including—
(A) the time spent on such services;
(B) the rates charged for such services;
(C) whether the services were necessary to the administration of or beneficial at the time at

mine that compensation is proper, then the amounts to be awarded are evaluated under the new subsection 330(a)(3), which adopts into statutory form the modified lodestar method for measuring them.[20] Furthermore, while in general bankruptcy courts have wide discretion in the awarding of compensation, new subsection (a)(4) bars them from granting awards under certain circumstances, and thus circumscribes the courts' discretion. Note, however, that "[t]he policy of section 330 is to compensate attorneys serving in bankruptcy cases at rates comparable to those earned by attorneys performing similar services outside of Title 11 and thus expressly overrule the notions of conservation of the estate and economy of administration which were applicable under the Bankruptcy Act." *In re Casco*, 25 B.R. at 754. In short, a parsimonious spirit should be foreign to fee determinations.[21]

■ The key question is what is meant by "necessary" services. Even though this term is not defined in the statute, a close reading of subsection (a)(4)(A) sheds light on it. A service is not "necessary" if it is: unnecessarily duplicative, § 330(a)(4)(A)(I); not "reasonably likely to benefit the debtor's estate," § 330(a)(4)(A)(ii)(I); or not "necessary to the administration of the estate,"

§ 330(a)(4)(A)(ii)(II). Thus, by negative implication, a bankruptcy judge may award compensation for services that were: reasonably likely to benefit the estate, necessary to its administration, or not unnecessarily duplicative.

## A. Defense of Criminal Case

■ The Bank challenges the bankruptcy court's award of compensation to counsel for services rendered in defending the criminal case. The Bank argues that "Ramírez' criminal defense work produced no benefit to the estate.... As explained repeatedly to the bankruptcy judge, a conviction would give the PR–DOJ at most a monetary claim; the forfeiture of the debtor's charter would not prevent a successful reorganization; and forcing the trustee to defend a criminal trial would produce unnecessary expenses to the estate for little or no benefit to creditors," because "a conviction ... does not bind the secured creditor BKB, which continues to have the 'innocent owner/lienholder' defense." *Appellant's Brief,* at 18. Apparently, Ramírez' insistence in defending the criminal case was due to his "concern over the preclusive effect of criminal conviction on the pending civil action." Id.

which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable, based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) ... the court shall not allow compensation for—

(i) unnecessary duplication of services; or

(ii) services that were not—

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

(5) The court shall reduce the amount of compensation awarded under this section by the amount of any interim compensation awarded under section 331, and, if the amount of such interim compensation awarded under this section, may order the return of the excess to the estate."

**20.** Subsection 330(a)(3) was added in 1994, Act of October 22, 1994, Pub.L. 103–394, Title I,

§ 117, Title II, § 224(b), 108 Stat. 4119, 4130. No substantive change in the law occurred, however, since the First Circuit had traditionally applied the lodestar method. *In re Spillane*, 884 F.2d 642, 647 (1st Cir.1989); *Boston & Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir.1985); *In re Casco Bay Lines*, 25 B.R. at 755. See also *In re DN Associates*, 144 B.R. 195 (Bankr.D.Me.1992); *In re Saturley*, 131 B.R. 509 (Bankr.D.Me.1991); *In re Fruits International, Inc.*, 87 B.R. 769 (Bankr.D.P.R.1988); *In re C.P. Del Caribe, Inc.*, 143 B.R. 11 (Bankr.D.P.R.1992).

**21.** Any doubts remaining as to this point were dispelled by the amendments added by the 1994 Bankruptcy Improvement Act. The creation of new subsection 330(a)(3) was presumably intended to emphasize that the issue of compensability is both preliminary to and separate from the question of the amount of compensation to be awarded. The likely effect of this change is to end judicial second-guessing of bankruptcy attorneys' work, by further guaranteeing that legal services that seemed reasonable ex ante will be compensated even if the results were not the desired ones.

The Bank's objection is not entirely without merit because the court's stated justification is inapposite to a fee determination under § 330. Specifically, the court wrote that

A short answer to this objection is that we refused to

> allow counsel to resign because it disrupted [the] criminal trial: the Applicant had no choice. We also hold that benefit to creditors is not only measured in terms of a monetary dividend received as a result of the Trustee's administration of the estate. Benefit has a wider connotation. In this case, the benefit includes cooperating with the State's attempt to offer the accused a speedy and fair trial and to enforce the law.

*Opinion and Order,* at 7. We agree with the Bank that the court's concept of "benefit to the estate" is inconsistent with federal bankruptcy policy.

Whether or not the bankruptcy court may award attorneys' fees for the criminal defense of the debtor depends on whether the defense benefited the estate, primarily by protecting its assets. The majority of courts have followed the principles first set forth in *In re Duque,* 48 B.R. 965 (S.D.Fla. 1984), as follows:

> First, employment of special counsel must be in the 'best' interest of the estate. In determining whether the best interests are at stake, there must be an actual need for the services, based upon a threat to the estate or its property. The threat must be actual and real, not some hypothetical or speculative benefit which may or may not be realized. Criminal counsel must not be potentially in the estate's interest but reasonably and actually calculated to be in its best interest. Second, special counsel must be for the estate and not for the personal benefit of the debtor. The need for counsel must be for purposes of protecting the assets of the estate or furthering its interests. . . . Third, potential violations of the debtor's constitutional rights . . . are of concern to the criminal forum, not the bankruptcy court.

*In re Duque,* 48 B.R. at 974. Compensation was denied in that case, but only because the debtor was charged with fraud, to which no forfeiture penalty attached. Moreover, the court intimated that had the estate's property been subject to criminal forfeiture, it would have reached a different result. 48 B.R. at 975. Following the same reasoning, another court has held that where a conviction would have diminished the value of the estate, the trustee was authorized to hire special counsel to defend against the criminal charges. *U.S. v. Miller, Cassidy, Larroca & Lewin,* 141 B.R. 762 (M.D.Fla.1992). Similarly, although compensation was denied in several other cases, the decisions were premised on the fact that conviction would not have affected the estates. *In re Dixon,* 143 B.R. 671 (Bankr.N.D.Tex.1992); *In re French,* 139 B.R. 485 (D.S.D.1992); *In re Gherman,* 101 B.R. 367 (Bankr.S.D.Fla.1989); *In re United Church of the Ministers of God,* 84 B.R. 50 (Bankr.E.D.Pa.1988).

Nevertheless, as we noted above, we must affirm the bankruptcy court's judgment emphasizing alternate grounds. The court concludes that there were other legal grounds for finding that the defense of the debtor company benefited the estate and was therefore a compensable service, for in contrast to the foregoing cases, in the case before us there was good reason to be concerned about the repercussions that the criminal proceedings in state court could have on the bankruptcy estate's finances.

The Trustee was of the opinion that the estate would not suffer even if the debtor company were convicted, on the basis of a too-optimistic interpretation of Puerto Rico's Uniform Seizures Act, 34 L.P.R.A. § 1723 *et seq.* (1991 & Butterworth Supp.1995). In recent opinions, however, the Supreme Court of Puerto Rico has demonstrated a marked tendency to interpret the innocent third party defense to seizures and forfeitures so narrowly that they cast substantial doubt upon the Bank's ability to invoke it successfully. In the most recent case, various financial institutions challenged the seizure of motor vehicles whose sale had been financed by the plaintiffs pursuant to conditional sale agreements. *General Accident Insurance Co. v. Puerto Rico,* —— P.R.Dec. ——, No. CE–94–89, 94 JTS 140 (November 22, 1994). The court held, however, that the innocent owner

defense was unavailable to the defendants. The court explained that the seizures were in rem proceedings whereby, "if the owner, possessor, or bailor of the vehicle, or the person with a legal interest over the same, has voluntarily placed the offender in possession of the vehicle ..., the rights of the former are subject to the uses to which the offender might put the vehicle." *General Accident Insurance Co.*, 94 JTS at p. 410 (our translation). The court further noted that the only defense to such a seizure is proof that the owner did not voluntarily place the offender in possession of the vehicle, or when the owner has taken cautionary measures expressly designed to prevent the illegal use of the property in the commission of a crime. 94 JTS at p. 411. The result in that case is not an isolated occurrence, for in the earlier *Nieves–Vélez v. Bansander Leasing Corp.*, — P.R.Dec. —, No. RE–94–286, 94 JTS 115 (September 2, 1994), the leasing company was held jointly liable for the damage caused by the driver of the leased car.

Although this court might disagree with the result reached in these cases, which seem to have abandoned the parallel line of cases following *Ochoteco v. Superior Court*, 88 P.R.Dec. 517 (1963), the fact remains that as the law now stands, appellant Bank had a reasonable risk of losing its entire investment in Delta Petroleum. Delta filed under Chapter 11 precisely because it defaulted on its repayment of the loan when its assets were seized pursuant to the Uniform Seizures Act. The Bank, as a secured creditor, is in the same situation as the plaintiffs in *General Accident Insurance Co.*, and there is no evidence in the record that the Bank took any special cautionary measures. There is therefore no reason to conclude that the defense denied to the plaintiffs in *General Accident* would be available to the Bank.

 In sum, Mr. Ramírez was clearly correct in his determination that defending the criminal accusation against the debtor would be in the best interests of the estate.[22] In fact, Ramírez would have been remiss in not caring. Delta Petroleum's acquittal and the concomitant release of its assets only serve to underscore the accuracy of Mr. Ramírez' professional judgment. Therefore, the bankruptcy court acted well within its discretion in approving compensation for the services rendered in connection with the criminal case.

### B. Conflicts between Trustee and Trustee's Counsel

 The Bank objects to the award of compensation on the basis that a substantial portion of Mr. Ramírez' efforts were expended while acting without authorization from his erstwhile employer. Its argument is premised on 11 U.S.C. § 327(a), which states that "the trustee, with the court's approval, may employ one or more attorneys ... that do not hold an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." At the outset, we should note that this objection is not directed at the necessity of Mr. Ramírez' services, nor is the Bank alleging that Mr. Ramírez held an interest adverse to the estate, nor even that he was not a disinterested person. The issue is squarely one of fiduciary duties.

 This case involves a highly complex web of interdependent duties. A Chapter 11 trustee is a fiduciary of the estate, pursuant to 11 U.S.C. § 1106. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951). See, generally, 5 *Collier on Bankruptcy*, ¶ 1106.01[b], at 1106–7 to 1106–8 (Lawrence P. King, ed., 15th ed. 1994) ("[i]n addition to those duties specified in the Bankruptcy Act, the reorganization trustee is a fiduciary who has an obligation to treat all parties in a reorganization case fairly.").

---

22. The Bank's concept of the estate is also a source of concern. As noted above, the Trustee's stated reason for not worrying about the result of the criminal proceeding was that the creditors would not be affected. But while the Trustee should be commended for looking out for their interests, he seems to have forgotten that a course of action which preserves the debtor's viability while substantially guaranteeing the rights of creditors is preferable. After all, unlike Chapter 7 proceedings, Chapter 11 proceedings are aimed at preserving the debtor company whenever possible. *In re DN Associates*, 3 F.3d 512 (1st Cir.1993).

■ The situation is more complicated for trustee's counsel. On one hand, the attorney is retained at the trustee's request. On the other, the attorney's client is the estate, not the trustee. According to Model Rule 1.13(a), "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." *Model Rules of Professional Conduct* Rule 1.13(a) (1983). The Model Code provided similar guidance, in stating that "[a] lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity." *Model Code of Professional Responsibility* EC 5–18 (1981). By analogy, in the bankruptcy setting, trustee's counsel owes a higher fiduciary duty to the estate than to the trustee. *In re Johnson,* 1994 WL 163911, *2 (N.D.Cal.1994) (attorney retained under § 327 represents the estate and not the trustee in his individual capacity); see also *In re Rivers,* 167 B.R. 288 (Bankr.N.D.Ga. 1994) (when the interests of the debtor-in-possession conflict with those of the estate, it is the estate and the court to which the attorney owes his highest allegiance).

The entire controversy is traceable to the execution of the cash collateral stipulation, which modified the earlier carve-out agreement. The stipulation is conspicuously favorable to the Trustee, granting him up to three hundred thousand dollars ($300,000.00) in compensation. Particularly noticeable is the provision in the agreement that one third of that amount would not be deemed to be a portion of the compensation applied for in the Trustee's fee application to the court.[23] At the same time, even though the original agreement provided for sufficient funds to compensate counsel, the cash collateral stipulation reduces the amount available for such compensation to thirty-five thousand dollars ($35,000.00), a fraction of counsel's total fees, and well below the compensation previously approved by the court. To date, counsel has not been paid the amounts approved by the bankruptcy court in his second and third applications for compensation.

We conclude that the bankruptcy court, in the proper exercise of its discretion, took the course of action most reasonably directed at preserving the estate. The criminal charges against debtor Delta Petroleum potentially may have resulted in the forfeiture of the entire assets of the estate, in which case all creditors would have been left empty-handed. Faced with a difficult dilemma, the bankruptcy court took the only action possible—ordering counsel to continue representing debtor.

Further, counsel Ramírez had no choice but to continue providing services. Even though the bankruptcy court had granted his motion to withdraw as attorney of record for the trustee in the bankruptcy proceedings, the criminal court denied his motion to withdraw as debtor's attorney in the criminal case. When the bankruptcy court became aware of the criminal court's action, the court vacated the earlier order, thus forcing Ramírez to remain in the case.

Pursuant to the express mandate of Local Rule 1.16(c), "[w]hen ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation." D.P.R. Rules, Appendix II, Rules of Professional Responsibility, Rule 1.16(c).[24] It would have been grossly inequitable to force counsel to continue representation and then to deny counsel compensation for his services.

## C. Reconsideration of Awards of Interim Compensation

■ Finally, the Bank objects to the two interim fee awards for reasons essentially identical to its objections to the final fee award. However, the bankruptcy court denied the motion for reconsideration of the

---

**23.** One of the Trustee's fee requests was denied because the bankruptcy court found that he handled the sale of Delta's assets in a negligent manner.

**24.** The Rules of Professional Responsibility adopted by the United States District Court for the District of Puerto Rico are derived from, as well as substantially identical to, the Model Rules of Professional Conduct. See *Model Rules of Professional Conduct* (American Bar Association, 1983).

awards of interim compensation on the basis that the Bank's "failure to enter a timely objection in an orderly fashion, means they are estopped from doing so now." *Opinion and Order*, at p. 9. The court affirms on alternate grounds.

Admittedly, the Bank is justified in questioning the court's stated reasons for the denial of its motion, since new subsection 330(a)(5) explicitly raises the possibility that a bankruptcy court could reduce the amount of compensation to be awarded, or even order the disgorgement of fees already awarded.[25] Neither collateral estoppel nor any other form of preclusion can therefore attach to the interim fee awards. Instead, sections 330 and 331 operate in tandem to guarantee that professional services necessary for the administration of the estate will be available. Section 331 provides interlocutory compensation to attorneys, who might otherwise not be able to afford waiting until the end of the bankruptcy proceedings to receive compensation. On the other hand, interim awards can be premature. Subsection 330(a)(5) anticipates the possibility that in making the interim awards the court may overestimate that value.

 That is not to say, however, that interim fee awards are necessarily inaccurate; to the contrary, it is to be expected that in the normal course of events most interim awards would remain unmodified by the final fee award. In the case at hand, the court is satisfied that the court below had sufficient valid evidence on the record to make the interim awards. The Bank has failed to provide reasons, other than a reiteration of the arguments rejected above, for the court to conclude that the original valuation was excessive. Hence the interim awards are to remain undisturbed.

## VI. Conclusion

WHEREFORE the Court finds that the bankruptcy court did not abuse its discretion in approving the third compensation application, nor in refusing to vacate or modify the earlier fee awards. The bankruptcy court's

order of January 24, 1995, is therefore AFFIRMED.

IT IS SO ORDERED.

---

**25.** See footnote 19, *supra*, wherein subsection 330(a)(3) is cited in toto.