# United States Court of Appeals

## For the First Circuit

No. 02-9007                                  Volume II of II

IN RE WILLIAM C. SHERIDAN,

WILLIAM C. SHERIDAN,

Defendant, Appellant,

v.

NANCY MICHELS,

Plaintiff, Appellee.

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL

OF THE FIRST CIRCUIT

Before

Selya, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lynch, Circuit Judge.

William C. Sheridan, pro se.
Nancy H. Michels, with whom the Law Offices of Michels & Michels and Carole A. Mansur were on the brief for appellee.

March 29, 2004

**LYNCH**, **Circuit Judge** (dissenting). With regret, I dissent. The majority decides this case on an argument that Sheridan never raised in the bankruptcy court, in the BAP, or on appeal, and that Sheridan expressly refused to adopt when this court raised it sua sponte and asked for his view. The majority then decides that issue the wrong way. The result is to relegate Sheridan to a new round of litigation in the courts below, more than two years after the bankruptcy court suspended him from practice. For Sheridan, this is a pyrrhic victory, and one that he asked us not to give him.[19]

The principal opinion by Judge Cyr and the opinion by Judge Selya concurring in the judgment agree on two points that I believe are not only mistaken but also certain to have consequences beyond the narrow realm of attorney discipline in bankruptcy cases: (1) that this is an appropriate case for invoking the LaGuardia/Weinstein doctrine to justify this court in addressing an issue that Sheridan elected not to raise; and (2) that the disciplinary proceeding against Sheridan was not a "core proceeding" under § 157. I also dissent from the principal opinion's conclusion that Sheridan neither consented nor waived his objections to entry of a final order in the bankruptcy court.

---

[19]It is true that, after the court's decision, the order suspending Sheridan will no longer be final. But the district court may simply reinstate the remedy chosen by the bankruptcy court.

The principal opinion reaches the "core proceeding" question in this case only by holding that while Sheridan perhaps forfeited the issue, he never consented to the entry of a final judgment or otherwise waived the requirements of § 157. I cannot join that conclusion: (i) it requires a restrictive interpretation of § 157(c) that conflicts with the views of at least five circuits and the leading commentator on bankruptcy law; and (ii) it undermines this court's jurisprudence of waiver and consent to say, on this record, that Sheridan ever disputed the finality of the bankruptcy court's order.

## A.   Section 157 and Finality

A bankruptcy judge's power to enter final orders is not limited to core proceedings. Rather, a bankruptcy court has the authority to enter a dispositive order in any proceeding, irrespective of core/non-core status, if the parties consent. See § 157(c)(2); see also In re S. Indus. Banking Corp., 809 F.2d 329, 331 (6th Cir. 1987) ("A related proceeding with the consent of all parties functionally has the same effect as a core proceeding . . . ."). This court held unequivocally in In re G.S.F. Corp., 938 F.2d 1467 (1st Cir. 1991), that such consent can be implied from a party's litigation conduct. See id. at 1477 ("[I]mplied consent will suffice."). We upheld appellate jurisdiction in that case because the parties had, by their conduct before the bankruptcy

court, "acquiesce[d]" in the treatment of the proceeding as core. Id. If, by his conduct, Sheridan likewise indicated his knowing acquiescence in the bankruptcy court's treatment of his case as core, then the sanctions order was final, the BAP had appellate jurisdiction, and the core/non-core status of the disciplinary hearing is irrelevant.[20]

The principal opinion seems to interpret In re G.S.F. to require some "affirmative" expression of consent before a party will be held to have waived the procedures required by § 157(c). Op. at 8-10. That decision does not announce such a restrictive and formalistic rule; it did not require any particular conduct, but merely examined the record for "indication[s] of acquiescence." 938 F.2d at 1477. Further, in concluding that "implied consent

_____

[20]In a non-bankruptcy case, this issue would normally be characterized as "waiver." In bankruptcy cases, the more common rubric is that of "implied consent." The difference in terminology is not important; notions of waiver and consent are closely intertwined in the context of a litigant's asserted right to an Article III tribunal, as the Supreme Court has made clear. See, e.g., Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 849 (1986) ("[T]he relevance of concepts of waiver to Article III challenges is demonstrated by our decision in Northern Pipeline, in which the absence of consent to an initial adjudication before a non-Article III tribunal was relied on as a significant factor in determining that Article III forbade such adjudication."). Indeed, several courts of appeals have used both terms to describe the inquiry under § 157(c)(2). See, e.g., In re Johnson, 960 F.2d 396, 403-04 (4th Cir. 1992); Home Ins. Co. v. Cooper & Cooper, Ltd., 889 F.2d 746, 749 (7th Cir. 1989); see also In re Nell, 71 B.R. 305, 310 n.4 (D. Utah 1987). The terms are used interchangeably in this opinion, as the substantive standard is the same: because Sheridan knew of his right to seek de novo review in the district court and chose not to do so, the sanctions order should have been deemed final and the entire core/non-core problem avoided.

will suffice" under § 157(c)(2), this court cited cases like In re Daniels-Head & Assocs., 819 F.2d 914 (9th Cir. 1987), In re S. Indus. Banking Corp., supra, and In re Hatfield, 117 B.R. 387 (Bankr. C.D. Ill. 1990), each of which held that the absence of a timely objection to the bankruptcy court's jurisdiction is enough to establish consent. See 819 F.2d at 919; 809 F.2d at 331; 117 B.R. at 389 n.1.

The principal opinion contends that such cases must have been wrongly decided in light of the 1987 advisory committee notes to Fed. R. Bankr. P. 7008, which emphasize "express" consent. See Op. at 8 n.2. That argument, however, is undercut by the Supreme Court's recent decision in Roell v. Withrow, 123 S. Ct. 1696 (2003), in which the Court held that consent to proceedings before a federal magistrate judge can be implied from a party's litigation conduct. Id. at 1703. In Roell, as in this case, a federal rule interpreting the underlying statute required advance, written consent from both parties. Id. at 1701. As in this case, that rule was not satisfied. Nevertheless, the Roell Court held that under the terms of the statute itself, implied consent was all that was required. Id. at 1703. The same logic applies under § 157(c), which requires only "consent," not "express consent." Moreover, Congress knew how to require express consent when it wanted that result -- it did so in § 157 only a few paragraphs later. See 28 U.S.C. § 157(e) ("express consent" is required from all parties

-38-

before the bankruptcy court may hold a jury trial).  In light of Roell and Congress's calculated choice of words in § 157, the principal opinion's restrictive interpretation of the consent requirement in § 157(c) is unjustified.

Under the view adopted by the principal opinion today, a party's complete failure to object to core treatment is not sufficient to show consent.  That position, if adopted by this court, would place this circuit directly in conflict with the views of at least five of our sister circuits.  See In re Tex. Gen. Petroleum Corp., 52 F.3d 1330, 1337 (5th Cir. 1995) ("A party who fails to object to a bankruptcy court's assumption of core jurisdiction consents to that court's entry of final judgment."); Abramowitz v. Palmer, 999 F.2d 1274, 1280 (8th Cir. 1993) (finding implied consent where "[n]either party object[ed] to the bankruptcy court's entering a final judgment"); In re Johnson, 960 F.2d 396, 403-04 (4th Cir. 1992) (finding implied consent because the parties "failed to object to the bankruptcy court's determination" of the matters in dispute); In re Daniels-Head, 819 F.2d at 919 (failure to raise a timely objection to core treatment constitutes implied consent); In re Men's Sportswear, Inc., 834 F.2d 1134, 1137-38 (2d Cir. 1987) (party's failure to object to bankruptcy court's exercise of core jurisdiction despite multiple opportunities to lodge such an objection "can only be construed as implied

consent").[21]  The leading treatise on bankruptcy law likewise concludes that the failure to object to core treatment should be enough to show consent.  See 1 Collier on Bankruptcy § 3.02[6][b] (rev. 15th ed. 2003) ("It is unstated, but probably implied in section 157(b)(3), and it has been held, that failure to make timely objection to the characterization of the proceeding as a core proceeding will be deemed a consent to the jurisdiction of the bankruptcy court to enter dispositive orders and judgments in like manner as section 157(c)(2)."); id. § 3.03[4] ("The effect of failure to interpose an objection [to core treatment] at the pleading stage should be consent to the final order being entered by the bankruptcy judge.").

## B.  <u>Waiver in the Bankruptcy Court</u>

If the principal opinion's restrictive view of consent under § 157(c)(2) is wrong, it collapses.  That is because under the test adopted by other circuits and (in my view) endorsed by this court itself in <u>In re G.S.F.</u>, Sheridan waived any right he may have had to de novo review in the district court.

Sheridan utterly failed even to identify the core/non-core issue in the bankruptcy court, let alone raise a coherent objection to the core status of the proceeding, despite multiple opportunities to do so.  Neither in his responsive pleadings nor in

---

[21]<u>But see</u> <u>Home Ins. Co.</u>, 889 F.2d at 749-50 (express consent required).

his various motions to the bankruptcy court did Sheridan -- an experienced bankruptcy attorney[22] -- argue that the proceedings were non-core, that the bankruptcy court could not enter a final judgment against him, that he was entitled to de novo review of the facts and the law in the district court, or anything else that could be interpreted as a reference to § 157(c).

Nor did Sheridan identify this issue at the bench trial. The bankruptcy court entered a pretrial scheduling order on January 16, 2001 that required the parties to identify all disputed issues of law and applicable defenses. Sheridan, in response, raised various legal objections, not one of which addressed the core/non-core status of the proceeding or the bankruptcy court's power to

---

[22]The bankruptcy court expressly found that Sheridan "is an experienced attorney who has practiced [bankruptcy law] for a significant period of time." 2001 WL 1757058, at *24. The court further found that in light of that extensive experience, Sheridan "was aware" of the applicable rules and practices in bankruptcy court. Id.

Nevertheless, the principal opinion says that Sheridan's extensive experience as a bankruptcy attorney does not support the inference that he knowingly acquiesced in core treatment because "these disciplinary proceedings arose, at least in part, from Sheridan's numerous physical ailments and mental impairments." Op. at 15 n.7. That is a non-sequitur: whether Sheridan's misconduct was related to his alleged disabilities has nothing to do with whether Sheridan knew, based on his years of practicing bankruptcy law, that he was obliged to alert the bankruptcy judge if he objected to the treatment of his disciplinary proceeding as core. The principal opinion does not suggest that a disability actually prevented Sheridan from objecting to core treatment.

In any event, the principal opinion's willingness to attribute Sheridan's professional misconduct to his disabilities is puzzling, given that (1) the bankruptcy court made no finding of any disability, and (2) the BAP held that Sheridan utterly failed to support his claim of disability. See 282 B.R. at 92 & n.15.

enter a final judgment against him.[23]  Even during the bench trial,

Sheridan made no argument that the court was obliged to enter its

findings as "proposed findings of fact" under § 157(c)(1).   On

October 12, 2001, the bankruptcy court entered a final opinion and

order suspending Sheridan from practice.  <u>Michels</u> v. <u>Sheridan</u>, No.

00-1140-JMD, 2001 WL 1757058 (Bankr. D.N.H. Oct. 12, 2001).

     The principal opinion explains all of this by saying that

Sheridan could not have raised the core/non-core issue prior to

judgment because he had no idea that the bankruptcy court intended

to enter a binding sanctions order. Op. at 13.  That is simply not

so.  Sheridan has never claimed, and could not claim, that he was

unaware that the bankruptcy court intended to sanction him

directly.   The bankruptcy court's January 16, 2001 pretrial

scheduling order stated that the complaint against Sheridan had

been commenced under Administrative Order 2090-2 of the New

Hampshire bankruptcy courts.   That order expressly allows the

bankruptcy court to issue binding orders sanctioning and disbarring

attorneys by deeming attorneys who practice before the bankruptcy

court to have consented to disciplinary jurisdiction.[24]   Sheridan

_____

[23]Sheridan's reply stated only that the complaint failed to
allege violations of the applicable rules of ethics and that, in
the alternative, his conduct should be excused because of his
disabilities.

[24]AO 2090-2 provides, in relevant part, that "[a]ny attorney
admitted or permitted to practice before [the bankruptcy] court
shall be deemed to have conferred disciplinary jurisdiction upon
th[e] court for any alleged attorney misconduct arising during the

was clearly on notice that the bankruptcy court intended to hold such a proceeding, yet he did not dispute that it was a core proceeding or that any resulting order would be final.[25]

Even in his multiple motions for reconsideration after the bench trial, Sheridan failed to raise the core/non-core issue. In his October 22, 2001 motion, Sheridan responded to the bankruptcy judge's statement that bankruptcy courts have the substantive power to discipline attorneys under the "inherent power" doctrine of Ex parte Burr, 22 U.S. 529 (1824). See Sheridan, 2001 WL 1757058, at *1. Because the principal opinion relies heavily on Sheridan's response to conclude that he raised and pressed the core/non-core argument, I quote it here:

> First, Ex parte Burr, supra (U.S. 1824) concerns broad powers inherent in the exercise of the judicial power under Article III of the United States Constitution. However, although the United States Bankruptcy Court is a "unit of the [Federal] district court," it is well established that the powers of Bankruptcy judges are limited to those "conferred under" the United States Bankruptcy Code. 28 U.S.C. Section 151.
> As such the Bankruptcy court does not share all of the powers of the district court. Thus, in Northern Pipeline Co. vs. Marathon Pipeline Co., 458 U.S. 50 (1982) the United States Supreme Court held that it was

course of a case pending before th[e] court in which that attorney has participated in any way."

[25]Sheridan argued in his opening brief that AO 2090-2 was not promulgated until February 2001, after the disciplinary complaint against him was filed. That is not true: the administrative order was adopted in October 2000, and Sheridan is fairly charged with knowledge of its contents. An amended version of AO 2090-2 became effective in February 2001, but the amendments did not affect any portion of the order relevant to Sheridan's case.

> unconstitutional for the Bankruptcy Courts to exercise the "essential attributes of judicial power of the Article III district court," and that the bankruptcy court's power was limited to "core proceedings" of the administration of the bankruptcy estate under the bankruptcy code. 28 U.S.C. section 157(b)(1).
>
> It is axiomatic that since the bankruptcy court does not share in the "essential" powers of Article III judges, it follows that the bankruptcy court does not share in the "inherent authority" derived from the exercise of Article III judicial power.[26]

This was Sheridan's <u>sole</u> reference to "core proceedings" or § 157 in the bankruptcy court.

As the context makes clear, Sheridan was not objecting in these paragraphs to the finality of the bankruptcy court's order against him. Nor did the bankruptcy court understand him to be making such an argument. Rather, Sheridan was contending only that bankruptcy courts do not enjoy the "inherent power" described in <u>Ex parte Burr</u> to discipline attorneys. This is simply an attack on one of the bankruptcy court's asserted sources of disciplinary authority. It is distinct from the contention that the principal opinion attributes to Sheridan: namely, that the bankruptcy court, while empowered to conduct disciplinary proceedings, was not permitted to enter a final order against Sheridan under § 157(c)(1). Sheridan, an experienced bankruptcy lawyer, knows the difference. Indeed, the principal opinion itself recognizes that the question whether a bankruptcy court has the <u>power to discipline</u>

---

[26]This passage is quoted exactly from Sheridan's October 22 motion; any mistakes or grammatical errors are his.

-44-

attorneys is a question independent of whether it has the <u>power to enter a final order</u>.[27]  Yet the principal opinion contends that by raising the former argument, Sheridan somehow also raised the latter.[28]  This is unfair to bankruptcy judges, who should not be asked to read tea leaves to discern a litigant's argument.

---

[27]For example, the principal opinion concedes that bankruptcy courts have substantive disciplinary authority, but it holds that the exercise of that power in this particular case was not a "core proceeding."  <u>See</u> Op. at 28-29.  Sheridan essentially argued the opposite:  he challenged the substantive power of bankruptcy courts to discipline attorneys, but did not contest that the invocation of that power, if valid, would be a core proceeding.

[28]The principal opinion emphasizes Sheridan's citation to <u>Northern Pipeline Constr. Co.</u> v. <u>Marathon Pipe Line Co.</u>, 458 U.S. 50 (1982), which it describes as "<u>the</u> seminal case regarding the constitutional limitations which undergird the pivotal core/non-core distinction."  Op. at 16 (emphasis in original).  There is no doubt that the "core proceeding" concept reflects some of the Article III issues discussed in the plurality opinion in <u>Northern Pipeline</u>.  But it is more than a stretch to say that Sheridan's reference to that case amounts to an argument that the proceeding below was non-core under § 157.  Congress did not create the core/non-core distinction until after <u>Northern Pipeline</u>, so the citation alone hardly suffices to raise the issue.
More fundamentally, <u>Northern Pipeline</u> discussed at least five ways in which the Bankruptcy Act of 1978 unconstitutionally vested the "essential attributes" of judicial power in Article I bankruptcy judges, only <u>one</u> of which was the fact that bankruptcy judges were empowered to issue final orders that were binding and enforceable.  <u>See</u> 458 U.S. at 85-86. Significantly, another of the "essential attributes" cited by the <u>Northern Pipeline</u> Court was the power of bankruptcy judges to exercise "all ordinary powers of district courts," including issuing extraordinary writs and orders. <u>Id.</u> at 85.  This -- and not the core/non-core distinction -- was the proposition for which Sheridan cited <u>Northern Pipeline</u>. Sheridan  has consistently argued that under <u>Northern Pipeline</u>, bankruptcy courts lack the "inherent power" that district courts enjoy to discipline attorneys in the absence of statutory authorization. As noted above, this is logically distinct from the argument that bankruptcy courts <u>can</u> discipline attorneys but cannot enter final orders.

All of this, in my view, requires the conclusion that the bankruptcy court's order was final and appealable. Sheridan was plainly aware of the core/non-core distinction. He simply elected not to assert the issue, perhaps for strategic reasons. Perhaps he gambled that the bankruptcy judge's factual findings would be favorable to him, hoping to benefit from a more favorable standard of review on appeal. Perhaps he preferred to retain the option of appealing to the Bankruptcy Appellate Panel, as he ultimately did. Whatever his reasons, Sheridan abandoned any right he may have had to de novo review in the district court by choosing not to object to core treatment. See In re G.S.F., 938 F.2d at 1477; accord In re Tex. Gen. Petroleum Corp., 52 F.3d at 1337; Abramowitz, 999 F.2d at 1280; In re Johnson, 960 F.2d at 403-04; In re Daniels-Head, 819 F.2d at 919; In re Men's Sportswear, 834 F.2d at 1137-38. By refusing to infer consent from Sheridan's conduct, the majority simply encourages future bankruptcy litigants to game the system by waiting until an adverse judgment before objecting to core treatment. "Inferring consent in these circumstances . . . checks the risk of gamesmanship by depriving parties of the luxury of waiting for the outcome before denying the [bankruptcy judge's] authority. Judicial efficiency is served; the Article III right is substantially honored." Roell, 123 S. Ct. at 1703.

## C.   Waiver on Appeal

Sheridan's conduct on appeal, both in the BAP and before

this court, provides further assurance that he consented to core treatment. First, Sheridan elected to bring his appeal in the Bankruptcy Appellate Panel rather than in the district court, despite the fact that the BAP has no authority to review proposed findings of fact or conclusions of law under § 157(c)(1). The principal opinion dismisses this point, stating that Sheridan's appeal was proper because the bankruptcy judge ostensibly entered a final order. Op. at 16 n.8. That is true, but it does not negate the inference of consent: although Sheridan had an absolute statutory right to bring his appeal in the district court irrespective of the core/non-core issue, see 28 U.S.C. § 158(c)(1), and although the BAP notified Sheridan of that right in writing, Sheridan nevertheless pursued his appeal in the BAP. If, as the principal opinion contends, Sheridan had believed he was entitled to de novo review in the district court, the obvious choice would have been to invoke his right to appeal to the district court and then to demand de novo review. His decision to appeal to the BAP instead is strong evidence of his consent to core treatment. Cf. Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 849-50 (1986) (plaintiff's election to forgo review in federal court and seek relief instead in an Article I proceeding "constituted an effective waiver" of Article III objections because the party had the option of Article III adjudication but "chose to avail himself of the quicker and less expensive procedure Congress had provided

him").

Sheridan never argued to the BAP that the proceeding in the bankruptcy court was non-core. He merely repeated his argument about "inherent power" under Ex parte Burr. The BAP opinion makes clear that the finality of the bankruptcy court's order was never in dispute. See, e.g., In re Disciplinary Proceedings, 282 B.R. 79, 85 (B.A.P. 1st Cir. 2002) (referring to "final bankruptcy court orders" and indicating that the bankruptcy court's factual findings would be reviewed for clear error).

The final and most telling indication of Sheridan's consent to core treatment came before this court. Invited by the court to file a supplemental brief on the core/non-core question, Sheridan expressly declined to argue that the disciplinary hearing was non-core. His supplemental brief acknowledged the core/non-core issue and even cited § 157(c)(1), the provision barring bankruptcy judges from entering final orders in non-core proceedings absent the consent of the parties. Nevertheless, Sheridan refused to assert that the disciplinary proceeding was non-core -- he stated simply that he "takes no position" on whether the bankruptcy court order was final, and he urged this court to provide prompt and clear guidance on the merits of his appeal because his case had already been pending too long.[29]

---

[29]The principal opinion emphasizes that before Sheridan stated he "takes no position" on the core/non-core issue, he successfully briefed the argument that the proceeding below was non-core. Op.

-48-

**II.**

The second reason I cannot join the judgment is the majority's extension of the LaGuardia/Weinstein exception to our rules of waiver and forfeiture. See Op. at 17-19. The LaGuardia exception is inapplicable on these facts, and by invoking it here, the majority approves a novel and extremely unwise expansion of that doctrine.

Under LaGuardia and its progeny, the court of appeals may review de novo an argument that is raised for the first time on appeal only if: (1) the argument involves a purely legal question of constitutional import that can be resolved with certitude on the existing record; (2) addressing the argument will promote judicial economy because the same issue will arise in nearly identical terms in other cases; and (3) the argument, if meritorious, would almost certainly entitle the appellant to prevail, so that failing to address it would result in a miscarriage of justice. See United States v. LaGuardia, 902 F.2d 1010, 1013 (1st Cir. 1990); see also Castillo v. Matesanz, 348 F.3d 1, 12 (1st Cir. 2003); In re Weinstein, 164 F.3d 677, 685 (1st Cir. 1999); Sammartano v. Palmas del Mar Props., Inc., 161 F.3d 96, 98-99 (1st Cir. 1998). Until

at 16 n.8. Of course he did -- the whole point of the supplemental briefing was to address that argument, and Sheridan duly traced its contours. Yet despite demonstrating that he knew how to make the argument if he were so inclined, Sheridan expressly stated that he "takes no position" on the matter. The principal opinion attributes the argument to him anyway.

-49-

today, LaGuardia provided a narrow exception to the raise-or-waive rule, which this court ordinarily applies "with a near-religious fervor." Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995). Cases qualifying for the exception, we have said, are "few and far between." Id.

The majority's resort to LaGuardia on facts like these is unprecedented in multiple respects. First, this court has never invoked the LaGuardia exception when the party on whose behalf the court would intervene has not actually raised the issue on appeal. Here, not only did Sheridan fail to raise the core/non-core issue on appeal, but he also explicitly declined to advocate the position when asked.

In addition, the usual predicate conditions for invoking LaGuardia are absent here. The core/non-core distinction is not a matter of constitutional law or import, no more than any other question of statutory interpretation under the Bankruptcy Code.[30]

---

[30]The principal opinion insists that the core/non-core question is a question of "constitutional import," presumably because Congress created the core/non-core distinction in response to a Supreme Court case predicated on Article III. Op. at 19 & n.10. That argument is misplaced for two reasons. First, the fact that a statutory scheme reflects considerations of constitutional law does not elevate the statute itself to constitutional stature. We do not say, for example, that service of process under Fed. R. Civ. P. 4 is a question of constitutional dimensions, even though that Rule was plainly written to comport with constitutional due process concerns. Indeed, if the core/non-core issue is a matter of constitutional law, so too is the rest of the Bankruptcy Code insofar as it reflects Congress's judgment about how best to implement its powers under the Bankruptcy Clause, U.S. Const. Art. I, § 8, cl. 4.

Nor is the core/non-core determination "strictly a question of law." LaGuardia, 902 F.2d at 1013. The principal opinion itself recognizes that the core/non-core question in this case is not a purely legal one -- the court does not hold that attorney disciplinary proceedings are always non-core, but rather that the proceeding was non-core "[i]n the particular circumstances of the instant case." Op. at 5. And the core/non-core status of an omnibus attorney disciplinary proceeding initiated by a bankruptcy court is hardly a question that is "almost certain to be presented in identical terms in other cases." LaGuardia, 902 F.2d at 1013.

Similarly, the merits of the core/non-core issue in this case are neither "highly persuasive," Harwood, 69 F.3d at 628, nor "so compelling as virtually to insure [the appellant's] success,"

---

Second, the core/non-core distinction is nothing like the problems of constitutional law or import that have previously served as a predicate for this court's resort to LaGuardia. See, e.g., Castillo v. Matesanz, 348 F.3d 1, 11-16 (1st Cir. 2003) (ineffective assistance of counsel under the Sixth Amendment); In re Weinstein, 164 F.3d 677, 684-85 (1st Cir. 1999) (takings claim under the Fifth Amendment); Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 629 (1st Cir. 1995) (immunity of state legislature from First Amendment claim under federal common law, by analogy to the Speech and Debate Clause); United States v. Mercedes-Amparo, 980 F.3d 17, 19 (1st Cir. 1992) (due process concerns in prosecutorial breach of plea bargain agreement). In the few cases in which this court has invoked LaGuardia in the absence of a claim based directly in constitutional law, we have done so to vindicate a strong governmental interest of a kind not present here. See, e.g., Chestnut v. City of Lowell, 305 F.3d 18, 21 (1st Cir. 2002) (per curiam) (en banc) (relieving a city of punitive damages award under City of Newport); In re 604 Columbus Ave Realty Trust, 968 F.3d 1332, 1343-44 (1st Cir. 1992) (permitting the FDIC to raise special governmental defenses based on federal common law).

Sammartano, 161 F.3d at 98-99; United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992). Sheridan has not advanced the core/non-core argument at all, let alone advanced it in a "highly persuasive" manner, and the principal opinion's reasoning is not "so compelling" that the outcome is essentially predetermined. See Correa v. Hosp. San Francisco, 69 F.3d 1184, 1196 (1st Cir. 1995) (declining to invoke LaGuardia where the forfeited argument merely advanced one of two possible constructions of a statute).

Lastly, this case does not meet the final criterion for invoking LaGuardia: that if the issue were meritorious, failing to reach it would constitute a "miscarriage of justice." 902 F.2d at 1013. It could hardly be a miscarriage of justice to reach the merits of Sheridan's appeal given that both parties have urged us to do so. If there is any miscarriage of justice in this case, it is the disservice done to both sides in remanding this case for another round of litigation below.

If LaGuardia can apply here, it can apply in any case in which an appellate judge wishes to raise and decide an issue sua sponte, no matter how compelling the evidence of waiver or forfeiture and regardless of whether a party advocates that position. I will not be surprised if this aspect of the court's decision today is regretted by this court and the bar for years to come.

**III.**

Finally, I disagree with the majority's conclusion that the proceeding against Sheridan was non-core. In my view, the only interpretation of § 157 that is consistent with the purposes of the federal bankruptcy laws and Congress's intent in the 1984 bankruptcy amendments is that the disciplinary proceeding against Sheridan, which arose out of misconduct occurring in indisputably core proceedings, constituted a core proceeding.

**A.    Interpretation of 28 U.S.C. § 157**

**1.    Plain text of § 157**

Whether the disciplinary proceeding against Sheridan was a "core proceeding" under 28 U.S.C. § 157 is a matter of statutory construction. The plain text of § 157 makes no explicit reference to attorney discipline, sanctions, contempt, or anything similar, just as it fails to describe other proceedings that courts have recognized as core.[31] Nor is the statutory term "core proceeding" self-defining.

Nevertheless, the principal opinion purports to find support in the text of § 157. It discusses the various categories of core proceedings in § 157(b)(2), emphasizing that "each of the enumerated matters relates to a function essential to the

---

[31]See generally 1 Collier on Bankruptcy § 3.02[3] (rev. 15th ed. 2003) (listing examples of proceedings recognized as "core" even though they do not fall within the express terms of § 157(b)).

administration of the bankruptcy case." Op. at 21. The proceeding against Sheridan, the principal opinion contends, was different: it did not arise in any single bankruptcy case, so there was no relevant "case" to administer. Accordingly, it must have been non-core. This is an expressio unius rationale: Congress provided a list of core proceeding categories in § 157(b); that list does not include omnibus attorney disciplinary hearings or similar proceedings spanning multiple bankruptcy cases; therefore Congress meant to exclude such proceedings from "core" treatment.

This is flawed logic. As the Supreme Court reiterated last Term, the expressio unius canon applies only when the statutory list in question "justif[ies] the inference that items not mentioned were excluded by deliberate choice." Barnhart v. Peabody Coal Co., 537 U.S. 149, 168 (2003). No such inference is possible here. It is true that Congress, in drafting the categories of core proceedings in § 157(b)(2), referred to "the estate" (i.e., in the singular), but that choice of words merely reflects the reality that the vast majority of bankruptcy proceedings pertain to a single debtor. Nothing in the statute says a proceeding is non-core if it involves more than one estate, and Congress knew how to exclude matters from § 157(b) when it wished to do so. See, e.g., § 157(b)(2)(O) (excluding personal injury and wrongful death claims from core treatment). The clincher is that Congress specifically provided that the list of

examples in § 157(b)(2) is not exhaustive.  See 28 U.S.C. § 157(b)(2) (core proceedings "are not limited to" the listed categories); see also 1 Collier on Bankruptcy, supra, § 3.02[3] ("It should be emphasized at the outset that section 157(b)(2) is not limiting . . . .").

This brings us back to where we started.  The underlying question on the merits of the core/non-core issue is this: whether, in light of the structure and purpose of the core/non-core distinction and the Bankruptcy Code as a whole, § 157(b)(2) should be interpreted to embrace disciplinary proceedings like Sheridan's. See In re Hart, 328 F.3d 45, 48 (1st Cir. 2003).  The principal opinion undertakes no such analysis.

## 2.  **Background to the 1984 Bankruptcy Amendments**

In fact, there is every reason to believe that Congress wanted and expected bankruptcy judges to enforce the professional responsibilities of bankruptcy attorneys through final and binding orders where the misconduct in question occurred in a core bankruptcy proceeding or proceedings.[32]  In 1984, when Congress

---

[32]Long before Northern Pipeline and Congress's 1984 enactment of § 157, the Supreme Court recognized that a court's power to regulate the conduct of the bar, including the power to suspend and disbar attorneys, is essential to the administration of justice and the protection of the public. See, e.g., Roadway Express, Inc. v. Piper, 447 U.S. 752, 764-67 (1980); Theard v. United States, 354 U.S. 278, 281 (1957); Ex parte Bradley, 74 U.S. 364, 374 (1868); Ex parte Garland, 71 U.S. (4 Wall.) 333, 378-79 (1867); Ex parte Burr, 22 U.S. (9 Wheat.) 529, 531 (1824); see also In re Snyder, 472 U.S. 634, 643-45 (1985) ("Courts have long recognized an inherent authority to suspend or disbar lawyers.").

amended the Bankruptcy Code to create the core/non-core distinction, the case law available to Congress provided no reason to think that bankruptcy courts' status as Article I tribunals would bar them from entering final disciplinary orders. In 1926, the Supreme Court itself held in Goldsmith v. U.S. Bd. of Tax Appeals, 270 U.S. 117 (1926), that the U.S. Board of Tax Appeals, an Article I tribunal, possessed the authority not only to promulgate ethical rules for admitting attorneys to practice, but also to disbar attorneys who failed to meet those standards. See id. at 121-22 (emphasizing, in holding that the Board possessed this power, "the character of the work to be done by the board, the quasi judicial nature of its duties, [and] the magnitude of the interests to be affected by its decisions"). The Court explicitly rejected the contention that such a tribunal cannot disbar or discipline lawyers absent express statutory authority, observing that the power of the Board to do so is "so necessary . . . and so usual" that the statute creating it would be interpreted to include that power. Id. at 122.

Furthermore, Congress knew that federal courts before 1984 had upheld the power of other Article I tribunals to issue binding disciplinary orders against counsel appearing before them. See, e.g., Kivitz v. SEC, 475 F.2d 956, 962 (D.C. Cir. 1973) (power of SEC to disbar attorney for ethical misconduct); Herman v. Dulles, 205 F.2d 715, 715-16 (D.C. Cir. 1953) (similar,

International Claims Commission); <u>Francis</u> v. <u>Virgin Islands</u>, 11 F.2d 860, 864 (3d Cir. 1926) (upholding the contempt powers of the U.S. District Court for the Virgin Islands); <u>Fleming</u> v. <u>United States</u>, 279 F. 613, 616 (9th Cir. 1922) (similar, United States Court for China). Consistent with this line of cases, some courts had by 1984 already upheld the authority of bankruptcy courts to discipline attorneys for unethical conduct in bankruptcy cases. As early as 1979, for example, the Second Circuit described as "nothing novel" the proposition that a debtor's counsel could be sanctioned for breaching his ethical responsibilities to the bankruptcy court. <u>See</u> <u>In re Arlan's Dep't Stores, Inc.</u>, 615 F.2d 925, 943-44 (2d Cir. 1979).

Congress enacted the 1984 bankruptcy amendments against this background. Nothing in the 1984 Act or its legislative history suggests that Congress intended to deny bankruptcy judges the authority to regulate the bankruptcy bar. On the contrary, this court has held that Congress's purpose in the 1984 amendments was to press the jurisdiction of the bankruptcy courts "to its constitutional bounds" in the wake of <u>Northern Pipeline</u>. <u>See</u> <u>In re Arnold Print Works, Inc.</u>, 815 F.2d 165, 168 (1st Cir. 1987) (Breyer, J.). The congressional sponsors of the 1984 amendments described non-core proceedings as "<u>Marathon</u>-type" cases, referring to the <u>Northern Pipeline</u> decision, and they understood that category to be "very limited." <u>Id.</u> Accordingly, this court

concluded that "Congress intended that 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits." Id.

### 3. **Article III and attorney discipline**

Congress had no reason to think that Article III is offended when a bankruptcy court enters a binding order against a bankruptcy attorney for professional misconduct in a core bankruptcy proceeding. Even the principal opinion does not so contend. Indeed, less than a year after its decision in Northern Pipeline, the Supreme Court emphasized the limits of its holding: "The Court's holding in that case establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 584 (1985) (emphasis added).[33]

The proceeding at issue in Sheridan's case is fundamentally different from a traditional common-law cause of

---

[33]The Supreme Court endorsed this narrow reading of Northern Pipeline again the following year, repeatedly citing that case for the proposition that Congress's power to assign matters to non-Article III tribunals is constrained "where private, common law rights are at stake." Schor, 478 U.S. at 854; see also id. (noting that "private, common law rights were historically the types of matters subject to resolution by Article III courts," citing Northern Pipeline).

action.  The privilege to practice law, including the privilege to practice before a federal tribunal, is a matter of public license. See In re Snyder, 472 U.S. 634, 644 (1985).  It is well-settled that courts have the authority to revoke that license where necessary to protect the public.  See id.; In re Ruffalo, 390 U.S. 544, 550 (1968); Theard v. United States, 354 U.S. 278, 281 (1957); Ex parte Wall, 107 U.S. 265, 288-89 (1882).  Further, a disciplinary proceeding is a matter between the court and the attorney only; no right to a jury trial attaches.  See Ex parte Wall, 107 U.S. at 288.  It is akin to the enforcement of a "public right," and as then-Judge Breyer noted for this court in Arnold Print Works, the Supreme Court in Northern Pipeline found nothing unconstitutional in a bankruptcy judge issuing dispositive orders in such cases.  See 815 F.2d at 170.

### 4.  **Purposes of the Bankruptcy Code**

Nor is there any reason to infer from the overarching purposes of the Bankruptcy Code that Congress wanted to limit bankruptcy judges' power to issue final and binding orders disbarring, suspending, or otherwise disciplining attorneys who act unethically in core proceedings.  On the contrary, the need to maintain attorney discipline and enforce the rules of professional responsibility is, if anything, stronger in the bankruptcy context, where considerations of speed and cost-effectiveness are paramount:

> A sine qua non in restructuring the debtor-creditor relationship is the court's ability to police the

> fiduciaries . . . who are responsible for managing the debtor's estate in the best interest of creditors. The bankruptcy court must be able to assure itself and the creditors who rely on the process that court-approved managers of the debtor's estate are performing their work, conscientiously and cost-effectively.

In re Southmark Corp., 163 F.3d 925, 931 (5th Cir. 1999) (holding that a professional malpractice claim by a Chapter 11 debtor against a court-appointed accountant was a core proceeding). Bankruptcy courts are charged with the rehabilitation of financially distressed debtors and the reorganization or liquidation of their assets, often under the press of time because of the threat of financial loss. In re McLean Indus., 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986); see also United States v. Mourad, 289 F.3d 174, 179 (1st Cir. 2002) (observing that the power to regulate attorney behavior is necessary "if the bankruptcy courts are to carry out efficiently and effectively the duties assigned to them by Congress" (quoting In re Volpert, 110 F.3d 494, 500 (7th Cir. 1997))). Involving the district court in such disciplinary matters would "unduly burden the already complex and congested calendars of the district courts, and undermine the reasons for the district court's reference of Code cases to the bankruptcy courts." In re McLean Indus., 68 B.R. at 696; see also In re Mem'l Estates, Inc., 116 B.R. 108, 112 (N.D. Ill. 1990) (imposition of sanctions must be a core proceeding because "any other interpretation would seriously hamper the bankruptcy court in its administration of the estate and

would provide additional methods of multiplying litigation for those seeking to hinder and delay the proceedings in the bankruptcy court").

Congress, moreover, must have been aware that problems of attorney discipline are particularly acute in the consumer bankruptcy area, see In re Bruzzese, 214 B.R. 444, 450-51 (Bankr. E.D.N.Y. 1997), such as the Chapter 13 proceedings in which Sheridan specialized. Consumer debtors, like those whom Sheridan represented, rarely have the resources or sophistication to bring tort claims for legal malpractice. Indeed, because of the high volume of consumer bankruptcy filings and the speed at which bankruptcy courts must process such petitions, many consumer debtors "never discover that their attorneys have committed malpractice." Id. at 450. Direct discipline by the bankruptcy court may be the only feasible means in many cases of protecting debtors and ensuring the ethical conduct of the consumer bankruptcy bar in core proceedings. For this reason, "[b]ankruptcy judges are expected by Congress, the public, the appointing courts of appeals, and the leadership of the bar to maintain high standards of performance by all lawyers appearing before them. This is 'part of the job description.'" Id. at 450-51.

### 5. "Core comes from core"

I do not contend that Congress intended all attorney disciplinary proceedings in the bankruptcy courts to be core

proceedings, regardless of how they arise. There are situations in which the justifications for permitting bankruptcy judges to issue binding disciplinary orders are less compelling -- for example, when an attorney acts unethically in a non-core proceeding in which the parties have refused to consent to the entry of a final order on the merits. In such cases, the bankruptcy court must recommend findings of fact and conclusions of law to the district court in any event; there is little reason to treat the disciplinary issues alone as within the bankruptcy court's core powers.

As to unethical conduct in core proceedings, however, Congress's purposes in the Bankruptcy Code are much better served by a rule that permits bankruptcy judges to issue final and binding disciplinary orders directly, without resort to the district court but with normal rights to appeal. In fact, there is a widely accepted rule in attorney discipline cases that "core comes from core" -- that is, disciplinary hearings arising out of core proceedings are themselves core proceedings. See, e.g., Memorial Estates, 950 F.2d at 1370; In re O'Connor, 2001 WL 1335883, at *1 (N.D. Tex. 2001); In re French Bourekas, Inc., 183 B.R. 695, 696 (Bankr. S.D.N.Y. 1995) ("[T]he power to sanction parties for conduct in a core matter is itself core."), aff'd, 195 B.R. 19 (S.D.N.Y. 1996); In re VIII S. Mich. Assocs., No. 94C 5593, 1994 WL 698489, at *5 (N.D. Ill. 1994); Fed. Sav. & Loan Ins. Corp. v. Sutherlin, 109 B.R. 700, 703 (E.D. La. 1989); In re Usoskin, 61

B.R. 869, 872 (Bankr. E.D.N.Y. 1986); In re Emergency Beacon Corp., 52 B.R. 979, 987 (Bankr. S.D.N.Y. 1985), aff'd, 790 F.2d 285 (2d Cir. 1986); see also In re Monarch Capital Corp., 173 B.R. 31, 35-39 (D. Mass. 1994) (contempt proceeding against debtor's attorneys was core because the contempt occurred in a core proceeding).

The "core comes from core" rule also makes practical sense. One chief functional difference between a core proceeding and a non-core proceeding is the deference accorded to the bankruptcy court's findings of fact. Compare Fed. R. Bankr. P. 8013 (review of core proceedings), with Fed. R. Bankr. P. 9033(d) (review of non-core proceedings); see generally In re Delta Petroleum (P.R.), Ltd., 193 B.R. 99, 106 (D.P.R. 1996). In a core proceeding, the bankruptcy judge is empowered to make factual findings on the merits and to have those findings reviewed only for clear error. No useful purpose is served by denying the bankruptcy court the power to make equally authoritative findings of fact about the conduct of the very attorneys who appear before it. "If the bankruptcy courts are to administer 'the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power,' they must also have the power to sanction parties that interfere with such administration." In re Emergency Beacon Corp., 52 B.R. at 987.

Under the "core comes from core" principle, the proceeding against Sheridan was plainly a core proceeding. The

overwhelming majority of the ethical violations of which Sheridan was accused occurred in core proceedings. The bankruptcy court found that Sheridan committed at least 83 ethical violations over 33 separate bankruptcy cases.[34] It is clear from the record that at least 80 of those 83 violations, accounting for fully 31 of the 33 cases, occurred in core proceedings (specifically, proceedings to propose, file, modify, and confirm Chapter 13 plans).[35] Further, there has been no showing that the remaining three instances of misconduct occurred in non-core proceedings; rather, it is simply impossible to tell from the record whether those proceedings were also core. As a result, the only impediment to applying the "core comes from core" rule in this case is a set of 3 ethical violations in proceedings whose core/non-core status is unknown. Even assuming that those violations (which accounted for less than 1/20th of the charges against Sheridan) occurred in non-core proceedings, there is no reason to think that they materially

---

[34]In addition, the court determined that Sheridan committed five violations in the disciplinary proceeding itself, bringing the total to 88 violations in 34 cases.

[35]The vast majority of Sheridan's infractions involved failing to file certificates of service for his clients' Chapter 13 plans (17 times in 16 cases); failing to file documents or motions related to his clients' Chapter 13 petitions in a timely manner (39 times in 28 cases); and failing to appear or appearing late at court hearings (8 occasions) and § 341 meetings (3 occasions) related to Chapter 13 petitions. Matters concerning the confirmation of a debtor's plan for reorganization, including Chapter 13 plans, are core proceedings. See 28 U.S.C. § 157(b)(2)(L).

affected the bankruptcy court's choice of sanction.  Cf. Sheridan,
2001 WL 1757058, at *23 (declaring that the evidence at trial
"clearly establishes" that Sheridan is not professionally
competent).

### 6.  Summary

The court's constrained reading of § 157 contradicts
Congress's intent in the 1984 amendments, which was not to shrink
the powers of the bankruptcy courts but to extend them to their
jurisdictional limits in the wake of Northern Pipeline.  In light
of the open-ended statutory text of § 157; the clear congressional
intent that courts should interpret the term "core proceeding"
broadly; the binding precedent in our own circuit commanding that
we do so; the absence of relevant constitutional constraints; the
legitimate functional need for bankruptcy courts to have "core"
jurisdiction over attorney misconduct arising in core proceedings;
and the broadly accepted rule that "core comes from core," I think
we would be obliged to hold, were the issue properly presented,
that the disciplinary proceeding against Sheridan was a "core
proceeding" under § 157.

### B.  The Principal Opinion's Four Distinguishing Factors

The principal opinion reserves the question of whether
attorney disciplinary proceedings may ever enjoy core status,
holding instead that Sheridan's case is distinguishable on four
grounds:  (1) the disciplinary proceeding against Sheridan did not

take place in the context of an ongoing bankruptcy case, but rather was an "omnibus" proceeding spanning multiple cases; (2) the rule of decision in Sheridan's disciplinary proceeding came from state-law ethics rules, rather than federal law; (3) any potential effect on a closed bankruptcy case is remote and speculative; and (4) the bankruptcy court's disciplinary order was "extreme" relative to Sheridan's misconduct. See Op. at 31-32. Not one of these grounds is valid basis for distinguishing this case.

### 1. Omnibus vs. individual disciplinary proceedings

The principal opinion first argues that Sheridan's case merits different treatment because it was an "omnibus" disciplinary investigation -- that is, because the bankruptcy court consolidated the ethical issues arising in multiple, independent bankruptcy cases into a single disciplinary hearing.

This objection is without merit. Nothing in § 157 restricts core proceedings to proceedings that concern a single bankruptcy case, and the principal opinion cites no authority for its suggestion that § 157(b) should be interpreted so narrowly. Compare Arnold Print Works, 815 F.2d at 168. There is no functional reason to discourage bankruptcy courts from combining disciplinary issues spanning multiple bankruptcy cases into a single proceeding for expeditious administration. Normally this court encourages and respects the efforts of lower courts to manage their dockets efficiently. In re Atlantic Pipe Corp., 304 F.3d

135, 143-45 (1st Cir. 2002); <u>A.M. Capen's Co., Inc.</u> v. <u>Am. Trading</u> <u>& Prod. Corp.</u>, 202 F.3d 469, 472 n.4 (1st Cir. 2000); <u>Rosario-Diaz</u> v. <u>Gonzalez</u>, 140 F.3d 312, 315 (1st Cir. 1998). Moreover, attorney discipline in the federal courts outside of the bankruptcy context is frequently imposed in "omnibus" proceedings. <u>See, e.g.</u>, <u>United</u> <u>States</u> v. <u>Johnson</u>, 327 F.3d 554, 558, 561-62 (7th Cir. 2003); <u>In re</u> <u>Smith</u>, 76 F.3d 335, 336 (10th Cir. 1996) (per curiam). Surely Congress would not have wanted the bankruptcy judge to hold 30 separate disciplinary hearings before entering a binding sanctions order against Sheridan.

The case law confirms that "omnibus" disciplinary hearings in the bankruptcy courts are generally treated as core proceedings. For example, the Fifth Circuit in 1999 affirmed a four-year suspension imposed by a bankruptcy court in a proceeding that involved evidence of misconduct in three separate bankruptcy cases. <u>See</u> <u>In re Dragoo</u>, 219 B.R. 460, 465-68 (Bankr. N.D. Tex. 1998), <u>aff'd</u>, 186 F.3d 614 (5th Cir. 1999). The court of appeals did not take issue with the bankruptcy court's express entry of a final order under Fed. R. Bankr. P. 7052.[36] <u>See</u> 219 B.R. at 468 n.2. <u>See also</u> <u>In re Melendez</u>, 235 B.R. 173, 181-82, 201-04 (Bankr. D. Mass. 1999) (imposing sanctions in an omnibus disciplinary

---

[36]Bankruptcy Rule 7052 makes Fed. R. Civ. P. 52 applicable to bankruptcy proceedings. An order entered under Rule 7052 is a final judgment. <u>See</u> Fed. R. Civ. P. 52(a); <u>see also</u> <u>In re Werthen</u>, 329 F.3d 269, 272 (1st Cir. 2003) (findings of fact under Bankruptcy Rule 7052 are reviewed for clear error).

hearing initiated <u>sua</u> <u>sponte</u> by the bankruptcy court against several debtors' attorneys for inadequate representation of their respective clients, and expressly entering its findings under Bankruptcy Rule 7052); <u>In re Nesom</u>, 76 B.R. 101, 102 & n.1 (Bankr. N.D. Tex. 1987) (suspending an attorney for misconduct in two bankruptcy cases after a <u>sua</u> <u>sponte</u> disciplinary hearing by the court, and expressly terming the proceeding core).

The principal opinion's objection to consolidated disciplinary proceedings also makes little sense in light of the rules of evidence. By the principal opinion's reasoning, the bankruptcy court in Sheridan's case could simply have framed its hearing as an investigation into Sheridan's misconduct in a single bankruptcy case, then admitted evidence of Sheridan's misconduct in other cases under Fed. R. Evid. 404(b) and entered a final order on that basis. <u>See</u> <u>In re Ludwick</u>, 185 B.R. 238, 242-47 (Bankr. W.D. Mich. 1995) (en banc) (following this approach in suspending a bankruptcy attorney from practice for two years); <u>see also</u> <u>id.</u> at 239 (determining that the hearing was a core proceeding). It elevates form over substance to hold that the functionally equivalent approach selected by the bankruptcy court in this case rendered the proceeding non-core.[37]

---

[37]For similar reasons, there is no justification for the principal opinion's suggestion that the power of a bankruptcy judge to enter binding disciplinary orders should depend on whether the bankruptcy judge personally witnesses the attorney's misconduct.

## 2. **Source of law**

The principal opinion next argues that the proceeding against Sheridan should be characterized as non-core because the underlying substantive ethics rules "derive . . . from state law." Op. at 24-25. That is flatly wrong. The rules of attorney conduct in federal court are <u>federal</u> law, not state law. The Supreme Court so held in <u>In re Snyder</u>, in which the court of appeals had asserted that an attorney's ethical obligations in federal court are defined by state law. The Supreme Court disagreed: "The state code of professional responsibility does not by its own terms apply to sanctions in the federal courts. Federal courts admit and suspend attorneys as an exercise of their inherent power; <u>the standards imposed are a matter of federal law</u>." 472 U.S. at 645 n.6 (emphasis added); <u>see also</u> <u>In re Larry's Apartment, L.L.C.</u>, 249 F.3d 832, 837-38 (9th Cir. 2001) (federal law, not state law, governs the imposition of sanctions in federal bankruptcy cases). This case did not involve a "state law claim that could exist outside of bankruptcy." <u>In re ACI-HDT Supply Co.</u>, 205 B.R. 231, 236 (B.A.P. 9th Cir. 1997). Rather, it involved a federal bankruptcy judge's enforcement of federal standards of conduct against an attorney who practiced in the federal bankruptcy courts.

In any event, the focus on the source of the applicable law is beside the point. As this court held in <u>Arnold Print Works</u>, "[i]t is the <u>nature</u> of the proceeding -- its relation to the basic

-69-

function of the bankruptcy court -- not the state or federal basis for the claim, that makes the difference here."  815 F.2d at 169 (emphasis added).

### 3. **Closed cases**

The principal opinion also attempts to distinguish the proceeding against Sheridan on the grounds that much of the charged misconduct occurred in now-closed bankruptcy cases,[38] so that any remedy ordered by the bankruptcy court is unlikely to concern the administration of those clients' estates.  Therefore, the principal opinion argues, the proceeding cannot be core because it neither "concern[s] the administration of [an] estate," § 157(b)(2)(A), nor "affect[s] the liquidation of the assets of [an] estate," § 157(b)(2)(O).

This, too, is unpersuasive.  The bankruptcy court's imposition of sanctions on Sheridan did in fact "concern[] the administration of the estate" in each of the underlying bankruptcy cases within the meaning of § 157(b)(2)(A).  That section conspicuously does not require that the proceeding in question contemporaneously <u>affect</u> the <u>ongoing</u> administration of the estate;

---

[38]Neither the principal opinion nor the concurring opinion acknowledges that several of the underlying bankruptcy cases were <u>still pending</u> at the time the disciplinary proceeding against Sheridan was instituted in October 2000.  Indeed, several of the instances of misconduct proven during the bench trial occurred as late as November 2000, <u>after</u> the disciplinary proceedings had begun.  At least in these cases, the disciplinary action against Sheridan was literally a "matter[] concerning the administration of the estate."  § 157(b)(2)(A).

the matter must simply "concern[]" the administration of the estate. Compare § 157(b)(2)(O) (core proceedings include "other proceedings affecting . . . the debtor-creditor . . . relationship" (emphasis added)). And the imposition of sanctions against the debtor's attorney necessarily "concern[s]" the administration of the debtor's estate because, in a Chapter 13 case, the debtor's attorney is paid with funds from the estate in an amount "based on a consideration of the benefit . . . of [the attorney's] services to the debtor." 11 U.S.C. § 330(a)(4)(B); see also id. § 503(b)(2) (authorizing payments to attorneys under § 330(a) as "administrative expenses" of the estate); cf. Delta Petroleum, 193 B.R. at 106 (disputes over the appointment and compensation of attorneys are core proceedings because they concern the administration of the estate).

The majority's rule would require a bankruptcy court even in a single core proceeding to interrupt its adjudication of the debtor's petition to decide, then and there, an attorney disciplinary matter. It would preclude the court, on penalty of converting the proceeding from core to non-core, from waiting to deal with the attorney until after it had dealt with debtor's and creditors' arguments. That priority is backwards.

Moreover, even in the majority's terms, the order sanctioning Sheridan "concern[ed]" the administration of the underlying estates because it provided a clear basis for re-opening

-71-

those cases, which the bankruptcy court may do whenever it finds "cause." See 11 U.S.C. § 350(b) ("A case may be reopened . . . to administer assets, to accord relief to the debtor, or for other cause."). The principal opinion characterizes the possibility of reopening the underlying cases as "remote and overly speculative." Op. at 31. But at least one bankruptcy court has reopened a case "for cause" due to evidence of ineffective representation by the debtor's counsel. See Bruzzese, 214 B.R. at 449-50. Moreover, there is no warrant in § 157(b)(2) for insisting on proof that a proceeding will alter the administration of the estate; the statute requires only that the proceeding "concern[]" its administration. The narrower reading is contrary to this court's conclusion in Arnold Print Works that Congress intended the term "core proceeding" to be interpreted expansively.

Lastly, there is no independent problem with imposing sanctions on an attorney for misconduct that occurred in a since-closed case. Disciplinary proceedings against attorneys do not depend on the continued pendency of the underlying action and can be imposed long after a judgment on the merits. See Chambers v. NASCO, Inc., 501 U.S. 32, 56 (1991); Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 396 (1990). This has been the rule in bankruptcy cases as well. See In re Hasan, 287 B.R. 308, 311-12 (Bankr. D. Conn. 2002) (collecting cases); see also In re Rambo, 209 B.R. 527, 528-29 (B.A.P. 10th Cir. 1997) (dismissal of

-72-

underlying Chapter 13 case did not affect BAP's jurisdiction to decide appeal of sanctions order); In re Balboa Improvements, Ltd., 99 B.R. 966 (B.A.P. 9th Cir. 1989) (similar).

### 4. "Extreme" nature of the sanction

Finally, the principal opinion cites the "extreme" nature of the sanction imposed on Sheridan as a justification for holding that the proceeding against him was not core. Op. at 31-32. This conflates the core/non-core question with the merits of Sheridan's appeal. Whether the bankruptcy court's chosen sanction was "extreme" has nothing to do with whether it had the statutory authority to enter a binding order embodying that sanction. Suspensions and disbarments are severe sanctions that merit close review. But that review should have been done here.

### IV.

For the foregoing reasons, I respectfully dissent.